UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WALTER G. MATTHEWS,

        Plaintiff,

v.                                    Case No. 16-C-155

MARY SAUVEY, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

On May 12, 2016, Plaintiff Walter Matthews, an inmate at Green Bay Correctional Institution, filed this suit alleging his civil rights were violated under 42 U.S.C. § 1983 through deliberate indifference to his medical needs arising out of an injury to his Achilles tendon in his right foot. Though he filed his suit pro se, Matthews has since retained counsel. Through various amendments and a previous motion for summary judgment, many of the defendants have been dismissed. *See* ECF Nos. 53, 56. All that remain are Matthews' claims against Mary Alsteen, Dr. Mary Sauvey, Katie Bruckner, Yana Puisch, and Jean Lutsey. Together the state defendants, Alsteen, Dr. Sauvey, Puisch, and Lutsey, have filed a motion for summary judgment. ECF No. 72. Katie Bruckner has also filed a motion for summary judgment. ECF No. 66. These motions are fully briefed and ripe for decision. For the reasons explained below, the motions for summary judgment will be granted and the case will be dismissed.

## I. BACKGROUND

Matthews' claim arise out of the medical treatment he received for an injury to his Achilles tendon while incarcerated at the Green Bay Correctional Institution ("GBCI"). Alsteen is a registered nurse in good standing and has been employed at GBCI as a Nurse Clinician II since 2007. State Defendants' Proposed Findings of Fact ("SDPFOF"), ECF No. 74, ¶¶ 1, 2. Jean Lutsey is also a registered nurse in good standing and was employed by GBCI as a Nurse Clinician II during the time in question. She began her employment with GBCI in 2003 and was promoted to Heath Services Manager on May 31, 2015. *Id*. at ¶ 3. Yana Pusich was employed as a Captain at GBCI. *Id*. at ¶ 5. Katie Bruckner was working at GBCI as an Advance Practice Nurse Prescriber, which means she can prescribe medication and serve as a primary care provider. Bruckner's Proposed Findings of Fact ("BPFOF"), ECF No. 68, at ¶¶ 2–6. Alsteen, Dr. Sauvey, Lutsey, and Pusich were all employed by the Wisconsin Department of Corrections (DOC). SDPFOF at ¶¶ 1, 3, 5, 26. Bruckner was employed by Maxim Physician Resources, which provided medical staff under a contract with DOC. BPFOF at ¶ 2.

On Friday, December 19, 2014, Matthews was injured will playing basketball. SDPFOF at ¶ 14. On December 20, 2014, Matthews saw Alsteen in the Health Services Unit ("HSU") and reported that he felt a pop in his right lower leg while playing basketball. *Id*. at ¶ 15. Alsteen examined him and as part of the evaluation, Alsteen consulted the prison's Musculoskeletal Nursing Protocol. *Id*. at ¶ 16. Matthews complained of pain and movement issues. *Id*. at ¶ 17. However, Alsteen noted there was no notable edema ("swelling") or bruising. *Id*. Alsteen also noted that Matthews could extend and flex his foot with pain. *Id*. Matthews did not report pain over his Achilles tendon. *Id*. Alsteen provided Matthews with crutches to assist him with walking.

2

*Id*. Alsteen also authorized ice, an extra pillow, ibuprofen, and a low bunk restriction for Matthews. *Id*. Alsteen gave Matthews a "feed cell" restriction, which allowed him to eat his meals in his cell. *Id*. Additionally, Alsteen instructed Matthews to rest and elevate his leg to see if it would improve. *Id*. Alsteen noted that Matthews did not present in serious stress or pain, nor did he present any facial expressions that would indicate pain. *Id*. at ¶ 19. Based on her observation that there was no obvious deformity, swelling, or bruising and that Matthews was able to move his foot, Alsteen believed Matthews had suffered from a general ankle injury. *Id*. Alsteen ordered a follow up visit, but determined that it was unnecessary to send him to a hospital for emergency care. *Id*. at ¶ 20. Additionally, Alsteen did not have to authority to perform or order an X-ray as a nurse. *Id*. at ¶ 21.

Alsteen had a follow up visit with Matthews on December 23, 2014. *Id*. at ¶ 23; *see also* ECF No. 75-1 at 66. She noted that Matthews complained of pain in the Achilles area now, but that he stated he could still walk on it. *Id*.; *see also* ECF No. 75-1 at 66. She also noted that he did not like the crutches because they were "too hard." *Id*.; *see also* ECF No. 75-1 at 66. Although Matthew notes he did not refuse the crutches, he offers no evidence to contradict Alsteen's report in which she states he was not using them. ECF No. 85 ¶ 23; ECF No. 84 ¶ 2. Alsteen also noted there was no swelling in the calf or Achilles; however, there was some mild swelling over the lateral malleolus. ECF No. 75-1 at 66. She had Matthews return the crutches because he was not using them. *Id.* at 66.

Matthews was then seen by Bruckner on December 23, 2014, as well. BPFOF at ¶ 15. When Matthews arrived, he was not using his crutches effectively. *Id*. at ¶ 16. Matthews was able to walk into the room without assistance. *Id*. Bruckner found Matthews' leg to be without

3

swelling, erythema (redness), or ecchymosis (bruising). *Id*. at ¶ 18; ECF No. 69-1 at 109. Although Matthews claims Bruckner's own records indicate swelling, the evidence he cites in support of his allegation is actually Alsteen's December 23 report which indicates no edema in the posterior calf, but some mild edema over the lateral malleous. Matthews Decl., ECF No. 84 ¶ 4; ECF No. 84-2. In any event, Bruckner noted that there were no masses up the calf area nor were there any step-offs (an irregular loss of tissue mass or gap beneath the skin) in the area of Matthews' right Achilles tendon. BPFOF ¶¶ 20–21. Bruckner did note that Matthews' Achilles tendon was tender to the touch. *Id.* ¶ 19. Based upon her examination, which included a lack of palpable masses or step-off in the Achilles tendon area, a lack of redness or bruising, and an ability to flex his foot, albeit with pain, Bruckner diagnosed Matthews with a probable Achilles strain. *Id*. at ¶ 23. Bruckner discontinued the order for crutches because Matthews had been walking without the use of them. *Id*. at ¶ 25. Bruckner maintained the order for ibuprofen, ice, and other nursing restrictions. *Id*.

Matthews does not know if his Achilles was ruptured when he visited Bruckner on December 23, 2014. *Id*. at ¶ 28. Matthews did not disagree with Bruckner's diagnosis of a probable Achilles sprain on that day. *Id*. at ¶ 29. Matthews made no further complaints about his Achilles until two months later, when he saw Bruckner for an allergy complaint. *Id*. at ¶ 30. During those two months, Matthews did not file a health services request to have his right leg injury reassessed or his need for crutches reevaluated. *Id*. at ¶ 32.

On February 25, 2015, Matthews visited Bruckner about allergy medication and told Bruckner that his right Achilles was still bothering him and that he had pain when flexing his foot and while walking. *Id*. at ¶ 31. Bruckner conducted an examination of Matthews' legs and found

4

trace swelling and pain to his lower right Achilles. *Id*. at ¶ 33; *see also* ECF No. 69-1 at 104. Bruckner noted a step-off at the lowest end of Matthews' Achilles. *Id*.; *see also* ECF No. 69-1 at 104. Based on her examination of his right leg on February 25, 2015, Bruckner suspected Matthews had suffered a torn or ruptured Achilles tendon and immediately completed a referral for him to be seen by a physician. BPFOF ¶ 36. She had no further involvement with his leg injury thereafter. *Id.* at ¶ 37. On that same day, Dr. Sauvey saw Matthews about his Achilles tendon. SDPFOF at ¶ 26. Dr. Sauvey noted that Matthews had swelling around his right Achilles midsection and that Matthews was able to point his toe and flex his ankle, but it was weaker. *Id*. Dr. Sauvey placed Matthews in a toe-down cast and scheduled an MRI and a consultation. *Id.*; *see also* ECF No. 69-1 at 103. Dr. Sauvey also ordered crutches, a feed cell restriction, and a spectator restriction at recreation. *Id.*; *see also* ECF No. 69-1 at 103.

On April 14, 2015, Matthews had a successful surgery to repair his Achilles. *Id*. at ¶¶ 38–39. On May 20, 2015, Matthews had a follow up visit with Dr. Sauvey and he reported that he heard and felt a "pop" in his wound as he climbed into his bunk on or about May 17, 2015. *Id*. at ¶ 64. Dr. Sauvey ordered an MRI and required Matthews to be non-weight bearing. *Id*. On July 20, 2015, Matthews received a second surgery to repair his Achilles. *Id*. at ¶ 71. Matthews has no complaints about the care he received from Dr. Sauvey prior to his second surgery. *Id*. at ¶ 72.

After his July 20th surgery, Dr. Sauvey ordered Matthews to use crutches at all times until further notice because he was not to bear weight on his right leg. *Id*. at ¶ 73. Dr. Sauvey also ordered that Matthews could receive phone calls on his unit until further notice. *Id*. On July 21, Dr. Sauvey added an order that Matthews may go to the processing building in a wheelchair for

5

scheduled visits until further notice. *Id*. at ¶ 74. Dr. Sauvey did not order a "no stair" restriction at this time. *Id*.

On August 3, 2015, Dr. Sauvey noted that Matthews was required to wear two heel lifts in his walking boot. *Id*. at ¶ 75. On August 27, 2015, Dr. Sauvey ordered Matthews to transition from a walking boot to shoes with heel lifts. *Id.* at ¶ 76. Dr. Sauvey also ordered high-top shoes to protect his Achilles tendon. *Id*. On September 2, 2015, Dr. Sauvey discontinued Matthews' crutches and ordered him to use a cane for assistance. *Id*. at ¶ 77. He also informed Matthews not to bear weight on his heel until evaluated by his surgeon. *Id*.

On September 4, 2015, Dr. Sauvey discontinued Matthews' order for visits in the processing building because it was reported to Dr. Sauvey that Matthews was seen walking up a set of stairs in the recreation building. *Id*. at ¶ 78. At some point between September 4 and September 11, 2015, Matthews complained about Dr. Sauvey removing his restriction which allowed him to take visits in the processing building. *Id*. at ¶ 80. Dr. Sauvey re-ordered the restriction for more 3 weeks and ordered that Matthews continue wearing his boot for 6 weeks. *Id*.

On September 25, 2015, Dr. Sauvey added an order that granted permission to Matthews to order two pairs of high-top shoes from Footlocker. *Id*. at ¶ 82. On October 8, 2015, Dr. Sauvey clarified that order by stating that Matthews must order his shoes from an institution vendor. *Id*. at ¶ 83. On October 12, 2015, Dr. Sauvey consulted with Matthews' surgeon, who clarified that Matthews did not require a high-top shoe, but rather a shoe with a heel lift. *Id*. at ¶ 84. Dr. Sauvey rescinded the extra shoe order because it was not medically necessary. *Id*. On October 15, 2015, Dr. Sauvey discontinued Matthews' restriction for visits in the processing

6

building because Matthews was reported to be climbing stairs during recreation. *Id*. at ¶ 86. On October 22, 2015, Matthews' walking boot was discontinued. *Id*. at ¶ 87.

In September 2015, Matthews ordered two pairs of shoes. *Id*. at ¶ 91. When they were received by the institution, they were evaluated on the property and clothing policy. *Id*. As a captain, Pusich oversaw operations of the property department and had the authority to deny items that violated policies. *Id*. at ¶ 93. Matthews' two pairs of shoes were denied for three reasons. *Id*. at ¶ 94. First, they were over the allowable price limit. *Id*. Second, Matthews had already ordered two pairs of personal shoes (which was the maximum he was allowed to have). *Id*. Third, the shoes were not from an approved vendor. *Id*. Matthews filed an inmate complaint alleging that his medically prescribed shoes were denied. *Id*. at ¶ 95. The Inmate Complaint Examiner contacted the Health Services Department and determined that Dr. Sauvey had rescinded her order for high-top shoes because Matthews' surgeon had indicated they were not medically necessary. *Id*. at ¶ 96. Furthermore, physicians do not have the authority to approve the ordering of non-allowed items that did not conform to the personal property policy. *Id*. at ¶ 97. Matthews shoes were denied because they did not conform to the institution's personal property policies. *Id*. at ¶ 98.

## II. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails

7

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

"At the summary judgment stage, the facts must be viewed in the light most favorable to the nonmoving party only if there is "genuine" dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). However, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record is taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Therefore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). The court is not required to search through the record to make an argument on behalf of a party. *See Corley*

8

*v. Rosewood Care Ctr.*, 388 F.3d 990, 1001 (7th Cir. 2004) (citing *Albrechtson v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Judges are not like pigs, hunting for truffles buried in the record.")). Therefore, "the party bearing the burden of proof on an issue may not simply rest on its pleadings, but must affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial." *First Nat'l Bank v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

### III. ANALYSIS

**A. Deliberate Indifference Standards**

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). The first element, that Matthews had an objectively serious medical condition, has been met. However, Matthews must still show that each state official was subjectively deliberately indifferent to that serious medical condition. Stated another way,

9

Matthews must show that each "defendant had actual knowledge of impending harm which he consciously refused to prevent." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996).

Furthermore, deliberate indifference is a high standard. Ordinary negligence, or even gross negligence, is not sufficient to establish deliberate indifference. *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991). Additionally, "[m]ere differences in opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id*. at 261–62.

**B. Alsteen and Bruckner**

Matthews has failed to establish a deliberate indifference claim against Alsteen or Bruckner as a matter of law. Matthews alleges that Alsteen and Bruckner were deliberately indifferent because they did not send Matthews to the hospital for an MRI when they examined him in December. He also argues that a jury could find them deliberately indifferent because they did not have much experience diagnosing the Achilles tendon and the musculoskeletal protocol that Alsteen followed does not mention the Achilles tendon.

Matthews has provided no evidence that would allow a jury to infer that either Alsteen or Bruckner was deliberately indifferent to his medical needs. Both were responsive to his complaints. Both examined his Achilles, his entire leg, and his demeanor for pain. Both diagnosed a soft tissue injury and offered him reasonable treatment based on that diagnosis. The fact

10

Matthews reported no further problems with his foot from the time Alsteen and Bruckner saw him on December 23, 2014, until Bruckner saw him to discuss his allergies on February 25, 2015, lends strong support to the conclusion that they had no reason to doubt their initial diagnosis. Even now, Matthews has offered no clear evidence that they were incorrect and that he did not suffer the tear to his tendon sometime later. Regardless of when the tear occurred, however, he has offered no evidence that they acted with deliberate indifference.

Matthews argues that the defendants' state of mind (that Alsteen and Bruckner "knew of and disregarded a substantial risk of harm") is an issue that turns on circumstantial evidence and should not be decided on summary judgment. He cites the *en banc* decision in *Petties v. Carter* to support his argument. 836 F.3d 722 (7th Cir. 2016). *Petties* is factually distinguishable, however, and the differences in the two case actually highlight the deficiencies in Matthews' case.

In *Petties*, a prisoner ruptured his Achilles while walking up the stairs. *Id*. at 726. Petties visited the prison doctor, who immediately diagnosed him with an Achilles tendon repture and then followed only part of his employer's protocol for treatment by prescribing him crutches, ice, and a pain killer. *Id*. The defendant doctor did not provide Petties with anything to immobilize the heel; despite the doctor testifying that the appropriate treatment, and part of the proper protocol, for a ruptured Achilles was to immobilize the heel. *Id*. at 731–32. In reversing the district court's summary judgment in that case, the Seventh Circuit explained that the doctor knew the tendon was ruptured and failed to follow the protocol for such an injury could support the inference that the doctor acted with deliberate indifference to the inmate's serious medical needs. *Id*. Stated another way, "where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to the risk

11

of the harm they caused." *Id*. at 731. The court thus concluded that "Petties has provided sufficient evidence to survive summary judgment." *Id*. at 733.

Matthews' circumstances are entirely distinguishable. First, Matthews was not diagnosed by anyone with a Achilles tendon rupture when he was initially seen in December. Rather, he was diagnosed with an ankle injury and then an Achilles strain. Second, Matthews has not provided any evidence that the diagnoses of ankle injury and Achilles sprain were such a departure from professional judgment or standards that they could not have been made by professional judgment. There is no evidence that the "defendants should have known better" in their diagnoses. *See, generally, Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) (applying *Petties* and finding no deliberate indifference because there was "[n]o evidence in this case supports an inference that Dr. David 'knew better' than to pursue the course of treatment that he did.").

Based on a medical treatise he cites, Matthews contends that an Achilles tendon injury is typically accompanied with a "clear popping sound" and that the next step is diagnosis with a Thompson test. He offers no evidence, however, that a nurse, such as Alsteen, or an Advance Practice Nurse, such as Bruckner, knew what the medical treatise he cites might say on the subject. In other words, he offers no evidence from which a reasonable juror could conclude that either Alsteen or Bruckner actually knew he had a torn Achilles tendon and were deliberately indifferent to his need for prompt medical treatment entirely different from what they provided. Unlike *Petties*, this case does not involve a doctor who knew immediately that the inmate suffered a torn Achilles and inexplicably failed to provide the prescribed treatment.

12

Indeed, Matthews implicitly admits that Alsteen and Bruckner did not realize the extent of his injury (assuming the initial injury was a torn Achillies), in arguing that they were unqualified and poorly trained "gatekeepers" whose protocol provided no guidance for diagnosing and treating an Achilles tendon injury and failed to mention the Achilles tendon at all. ECF No. 82 at 2–3. This is fatal to his claim that they were deliberately indifferent to his serious medical need. To prove deliberate indifference, "a plaintiff must first provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. By arguing that they failed to recognize the severity of his injury because of their poor training and guidance, Matthews has in effect argued away his claim against them. They could not have been deliberately indifferent to a medical need they did not know existed.

Lastly, by way of contrasting this case with *Petties*, we can look at Bruckner's response when on February 25, 2015, while seeing him for his allergies, Matthews mentioned to Bruckner that he was having further problems with his Achilles tendon. Upon examining his tendon at that time, she felt a "step-off" at the lowest end and immediately suspected that it was ruptured or torn. ECF No. 69 at ¶¶ 26, 27. Bruckner then completed a referral for him to be seen by a physician, and Dr. Sauvey saw him the same day. *Id.* at ¶ 29; PPFOF at ¶ 25–26. An MRI was scheduled, and when it confirmed the tear, surgery was scheduled. *Id.* at ¶¶ 27–28. This is the very opposite of deliberate indifference.

For all of these reasons, I conclude that Matthews has failed to provide any evidence that would allow a reasonable jury to find that Alsteen and Bruckner were deliberately indifferent in their treatment of his Achilles tendon. His claims against both therefore fail as a matter of law.

13

And since Matthews' claim against Bruckner fails, his claim against Bruckner's employer, Maxim Physician Resources, necessarily fails as well.

**B. Lutsey**

Matthews argues that Nurse Lutsey was deliberately indifferent because as the HSU manager, she was responsible for the protocols used in HSU. Matthews argues it was Lutsey's fault that the HSU had no protocol or procedure for treating a ruptured Achilles tendon. Matthews was seen for his injury in the HSU, however, on December 20 and 23, 2014, and again on February 25, 2015. Lutsey was not promoted to HSU manager until May 31, 2015. Therefore, she was not responsible for the HSU protocols at the time in question, and Matthews' claim fails as a matter of fact. Even if she was responsible, Matthews offers no evidence that the failure to supply the HSU with any particular protocol can constitute deliberate indifference to serious medical needs. At most, it would seem to amount to negligence, but on this record, even drawing that conclusion would seem unfair. In any event, because Lutsey was not personally involved in the treatment of Matthews, any deliberate indifference claim against her fails as a matter of law. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (requiring a plaintiff to show that the defendant was personally responsible for the deprivation of a constitutional right to recover under § 1983).

**C. Dr. Sauvey**

Dr. Sauvey placed Matthews in a toe-down cast after she diagnosed him with a partial Achilles tendon rupture and referred him to an outside provider for an MRI. Dr. Sauvey also provided him crutches, and ordered that he be fed in his cell and limited to spectator at recreation. PPFOF ¶ 26. She authorized a referral to an outside orthopedic clinic for surgical repair of his

tendon, which was done at St. Vincent Hosptial in Green Bay on April 15, 2015. *Id.* at ¶¶ 33–38. She saw Matthews for follow-up care after the surgery, and when told by him on May 20, 2015, that he felt and heard a "pop" as he was climbing into his bunk on several days earlier, diagnosed a second tear and ordered another MRI, which confirmed the re-injury to the tendon. A second surgery was performed on July 15, 2015. Matthews does not allege the Dr. Sauvey violated his constitutional rights or exhibited deliberate indifference to his medical needs throughout this period of time. Based on his response to the summary judgment motion, Matthews' only claim against Dr. Sauvey appears to be that she did not provide him with heel lifts after his second surgery.

There is strong reason to doubt whether Matthews assertion that he was not provided lifts is factually accurate. Matthews' medical reports indicate at least two occasions after his second surgery when he was wearing lifts at follow-up appointments. *See* ECF No. 75-1 at 22 (noting patient "wearing shoes with heel lift" on August 27, 2015); ECF No. 75-1 at 15 (noting patient wearing "low topped tennis shoes with double heel lift on right" on October 12, 2015). But even if Matthews is correct and he was not provided the lifts for his right shoe, he fails to offer any evidence that suggests it was Dr. Sauvey's fault. He does not dispute her statement, confirmed by the medical record, that on August 27, 2015, Dr. Sauvey added an order requiring Matthews to transition from a walking boot to shoes with heel lifts. PPFOF at ¶ 76. If in fact, as Matthews seems to claim, he did not actually receive the lifts, notwithstanding the statements in his medical records indicating he did, he offers no evidence it was Dr. Sauvey's fault. In other words, there is no evidence he ever reported to her he did not receive them or that she had any way of knowing

15

that her orders were not followed. Instead, it appears that Matthews' principal complaint at the time was that he did not receive the high-top shoes he ordered.

To the extent that Matthews claims Dr. Sauvey was deliberately indifferent in rescinding her prior authorization for his high-top shoes, that claim fails because it is a merely disagreement with Dr. Sauvey's choice to treat his injury with a heel lift rather than special shoes (which was also Matthews' surgeon's course of treatment). *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient."). Matthews' annoyance that he cannot wear high-top Air Jordans, rather than his prison-issued tennis shoes, is insufficient to state a claim of deliberate indifference. To the extent that Matthews claims that Dr. Sauvey was deliberately indifferent in rescinding her order that allowed him to take visits in the processing building after Matthews was seen walking up the stairs, that claim also fails on the merits. Matthews has provided no evidence that he experienced any harm by having that order rescinded and Dr. Sauvey reinstated it within a week. Without some harm being caused by it, there can be no deliberate indifference. Matthews' claim against Dr. Sauvey therefore fails as well.

**D. Pusich**

Matthews also accused GBCI Captain Pusich claim of deliberate indifference for denying him his high-top shoes. That claim also fails. There is no evidence that Pusich had any subjective knowledge that Matthews had a torn Achilles. Furthermore, the only evidence available shows that Pusich was told that high-top shoes were not medically necessary for Matthews' Achilles. The reasons for denying him the shoes he ordered were based upon proper non-medical considerations, and there is no evidence that Pusich was subjectively aware of any risk to

16

Matthews when she denied his high-top Air Jordans. Without subjective awareness, there can be no deliberate indifference claim.

## IV. CONCLUSION

In sum, no reasonable jury could find that any one of the defendants was deliberately indifferent to Matthews' medical needs. Defendants Motions for Summary Judgement (ECF Nos. 66 & 72) are therefore **GRANTED** and this case is **DISMISSED**. All federal claims are dismissed on their merits and with prejudice. Any state law claims are dismissed without prejudice for lack of subject matter jurisdiction. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this   12th   day of February, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court